UNITED STATES DISTRICT COURT

EASTERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| UNITED STATES OF AMERICA, | CASE NO.   6:10-mj-00143-MJS-1 |
| Plaintiff, | STATEMENT OF DECISION |
| v. | AND |
| BRIAN HAMBLIN | ORDER |
| Defendant. | |

_____/

I.   **INTRODUCTION**

At approximately 11:00 PM on August 23, 2010, Defendant Brian Hamblin was arrested by Yosemite National Park Law Enforcement Ranger Jarad Mitrea for violation of 36 CFR 4.23 (a)(1), being under the influence of alcohol or drugs, or a combination thereof, to an extent that rendered him incapable of safe operation of his vehicle, and for violating 36 CFR 4.23 (c)(2) by refusing to submit to testing to determine blood alcohol or drug content.

On August 24, 2010, a Criminal Complaint was filed against Mr. Hamblin charging him with four misdemeanor counts, the two referred to above, another for failure to comply

with the directions of a traffic control device (in violation of 36 CFR 4.12) and another for possession of a controlled substance (Vicodin, a prescription medication) in violation of 36 CFR 235 (b)(2)).   Defendant Hamblin pled not guilty to all counts.  The Government ultimately dismissed the "driving under the influence" and the "possession of a controlled substance" counts.

On July 27, 2011, the criminal complaint came to trial before the undersigned Magistrate Judge in the United States District Court for the Eastern District of California, Yosemite Division.   Defendant Hamblin appeared personally and through his counsel Michael Mitchell.   The government was represented by Thomas Kunder, certified law student.   See Local Rule 181. Trial proceeded on  Count 2 of the First Amended Criminal Complaint alleging a violation of 36 CFR 4.23 (c)(2), refusal to submit to testing, as aforesaid, and on  Count 3, failure to comply with the direction of a traffic control device (a "STOP" sign) in violation of 36 CFR 4.12. Testimony was heard and documentary evidence admitted, the case was argued, post-trial briefs were considered, and the case has been submitted for decision.

At trial, the Defendant through his attorney and in his testimony acknowledged that he had failed to stop at the stop sign and that he had refused to submit to a proposed test to determine alcohol or drug concentration in his blood.  However, he argued, in effect, that at the time of the arrest there was no probable cause to believe that he was under the influence of drugs or alcohol or a combination thereof to a degree that rendered him incapable of safe operation of his vehicle and thus that there was no probable cause to arrest him.  Defendant argued that since there was no probable cause for the arrest, there was no probable cause to subject him to the seizure of his blood.  Finally, defendant

argued that he had had legitimate medical reasons for refusing the blood test and that he advised Ranger Mitrea of same but was given no option to submit to alternative testing.

The first issue then for the Court to determine is whether probable cause existed to arrest the Defendant and require him to submit to a blood test. The following facts, most derived from a video recording of the investigation and arrest at the scene, were most enlightening on that issue.

None of the evidence is considered for purposes of determining whether Defendant was in fact under the influence of drugs or alcohol to the extent he was a danger to himself or others since that charge was dismissed. The issue of whether the refusal to submit to blood testing was legally justified arises and will be analyzed herein only if probable cause justifying the "search and seizure" of Defendant's blood is found to have existed. Thus, we examine the evidence presented to the arresting officer and evaluate whether it provided probable cause to arrest and test Defendant.

## II.   FACTS RELATING TO ARREST

### A.   Driving Violation

Just prior to 10:35 PM on August 23, 2010, Defendant Brian Hamblin was driving his Ford Explorer automobile northwardly along Yosemite Lodge Drive ("Lodge") in Yosemite Valley, Yosemite National Park, as Lodge approaches its intersection with Northside Drive. (Defense Exs. B-E and H depict the intersection from the view of someone approaching it in the same manner as Defendant approached it on August 23.[1])

---

[1]These photographs were taken by Defendant approximately 30 days after August 23, 2010, and according to his testimony, reflect the signage and markings on the road as they appeared on the night of August 23, 2010. The government did not dispute that claim or Defendant's claim that the government's exhibits do not accurately reflect the scene as it existed on August 23, 2011. Accordingly, the Court accepts Defense Exs. B-E and H as accurate representations of the intersection on the day of the alleged

Defendant was traveling at a low rate of speed which Ranger Jared Mitrea, who later stopped and then arrested Defendant, estimated at between five and ten miles per hour.

Defendant acknowledges that on the night of August 23 he saw the stop sign which appears in the referenced exhibits; however, he noted that it stands some considerable distance back from the intersection and from the "limit line" which is now there (and shown on government Exhibits 2, 3 and 5). From the photos, it appears there is approximately fifty feet of space between the stop sign and where the limit line currently sits. Only a short segment of the limit line appears in Defendant's photos. Apparently that is all that was there on the night of the arrest.

Defendant also testified that Lodge Drive is abutted by several parking lots and that the stop sign stands just north of where one parking lot entrance meets Lodge. At one point Defendant indicated a belief that Lodge itself was part of a parking lot rather than a public road. All of these factors caused him to question why the stop sign was present, but he felt it was set so far away from Northside Drive that it did not direct him to stop at the Northside Drive intersection. He saw no discernable limit line or other marking at the intersection to indicate that he was required to stop there. Nevertheless, he slowed as he approached the intersection, looked both ways and, seeing no traffic approaching, proceeded to turn right and travel east on Northside Drive.

Ranger Mitrea was at the time sitting in a patrol car parked in the parking lot on the west side of Lodge, south of the intersection and facing Lodge. He observed Defendant approach the intersection at, as noted, between five and ten miles per hour, apply his brakes, slow and then proceed through the intersection. He perceived nothing unusual or

offense, although depicting it in daylight instead of at night when the incident occurred.

-4-

inappropriate about Defendant's driving then or thereafter other than his failure to stop at the intersection.

Ranger Mitrea testified Defendant violated the law by failing to come to a complete stop at the intersection.[2]  He accordingly pulled out and, after traveling about two or three hundred yards, came upon Defendant, activated flashing lights, and pulled him over at the first location where the road was wide enough to accommodate the two cars outside of traffic lanes.

### B.   Questioning of Defendant; Possible Signs of Impairment

There was an apparently brief initial exchange during which Mitrea requested license, registration and insurance information from Defendant and, in addition,  Mitrea detected an odor of alcohol emanating from Defendant's vehicle.  At that point Mitrea activated the "ViewVu" video recorder attached to his uniform.  A copy of what he recorded appears as Joint Exhibit I.  A transcript of that recording is at Joint Exhibit II.

The recording runs for approximately 54 minutes; the transcript thereof is 59 pages long.  No useful purpose would be served by chronicling all that is reflected in the recording.  Instead, the Court will endeavor to summarize, not necessarily in chronological order, those specific exchanges and other events recorded on the video which Ranger Mitrea reportedly considered in deciding that there was probable cause to arrest Defendant.

### 1.   Driving Behavior.

As noted, other than the fact that Defendant failed to come to a stop at the

---

[2]He did not consider it a violation of the law for Defendant not to have stopped where the stop sign was located.

intersection of Lodge and Northside, Ranger Mitrea observed nothing about Defendant's driving to suggest impairment.

### 2.   Document Confusion.

Before he activated his video recorder, Ranger Mitrea asked Defendant for his driver's license, proof of  insurance and vehicle registration.  Ranger Mitrea testified Defendant seemed flustered as he searched for same and that he twice passed over his license while looking for it in his wallet.

### 3.   Nervousness; Stuttering.

Ranger Mitrea testified in effect that Defendant spoke with  stuttering speech and in choppy half-sentences and that this suggested nervousness on the part of Defendant. Behavior consistent with such a description  is observable in the video recording.  Indeed, during the course of Ranger Mitrea's interrogation of him, the defendant stated on more that one occasion that he was, indeed, nervous.

### 4.   Alcohol Odor.

Mitrea reported and testified that he smelled the odor of alcohol emanating from Defendant's vehicle.

### 5.   Alcohol Consumption Admitted but Initially Understated.

As the video recording begins, Mitrea asks the Defendant: "Sir, how much have you had to drink tonight?"  Defendant responds that he had "had a beer" earlier in the day. Minutes later, on further questioning, he added that he had also had a cocktail (vodka and soda) in the hour just preceding the stop by Ranger Mitrea. Ranger Mitrea then asked Defendant why he was "lying". When Mitrea asked if Defendant  felt the effects of his cocktail, the latter responded "Mm-hmm".  When asked if that was "Yes",  he responded

Mm-hmm".  Mitrea interpreted this as a "Yes"; he told fellow Ranger Lober, "...and he feels the effects of the alcohol."

6.    Medical Impairment: Medications.

The Defendant indicated to Ranger Mitrea that he had medical problems relevant to Ranger Mitrea's inquiry.

As he exited his vehicle at the direction of Ranger Mitrea, Defendant stated in response to a succession of questions: " I have a, a fake knee." "I am sick.  I have, I had a, an infection in my spine."  "A staph infection, so I am on medications."  "I'm on Oxycontin." He indicated that he had taken a twelve hour Oxycontin dosage at about 10:30 that morning and that it possibly "stipulated" "no drinking".

When asked if he felt the effects of his medication, Defendant responded "Yeah. Yeah.  I'm, I'm not a drinker you know?" When asked later how the medications made him feel, he said (interrupted at times by another ranger's (Ranger Lober who came to assist Ranger Mitrea) "Okay", etc): "Well, I'm, I've got a dry mouth...and, and you know, like, kind of, well, I don't , dizzy-like, but, but...it...Yeah, I, I'm not used to...this...dry mouth." Then Lober asked, "So you, dry mouth and dizziness right now?", defendant responded: "Not really dizzy."

He indicated he had knee and back impairments.  "I have a numb foot from an operation.  I, I can't move my ankle or foot. Look...." Ranger Mitrea observed that Defendant did move his ankle. Defendant stated that there was "...range, but it's numb. It doesn't have feeling...They cut the sciatic nerve...and so I'm impaired." He reaffirmed the numbness again later.  When asked whether his impairments gave him trouble walking, Defendant responded "Oh, yeah." He indicated that walking in response to Ranger Mitrea's

instructions (as part of a field sobriety test, discussed below) was "really hard for me". He asked Mitrea whether he could first demonstrate that difficulty by walking normally. His offer was declined.

He indicated he had had surgery on his back a year earlier and that his doctors told him it would take him about a year to recover. As he began the walking field sobriety test prescribed by Ranger Mitrea, Defendant stated: "This foot just–..."

After describing the above medical history and impairments to Ranger Mitrea and undertaking the walking test directed by Ranger Mitrea, Defendant was asked by Ranger Lober, "Sir, do you have a problem with your foot or ankle?", he responded to this and ensuing questions: "I do. I, I, I had a, a surgery on my back...and they nicked the sciatic nerve...and I don't have any feeling in my foot....Not only that , it's numb, so when I step, it, it's, it's not straight, you know?... So, so it, it , it bends over to the side. When, when they did my knee operation, they straightened this, this..." [As discussed below, Defendant displayed a similar staccato speech pattern at trial.]

It is to be noted that the Defendant's treating neurologist, Schenley L. Co, M.D. , a Board Certified Neurologist and Psychiatrist,  appeared at trial and generally corroborated the Defendant's description of his medical history and residual impairment.

7.   Field Sobriety Tests.

a.   Nystagnus Testing.

While Defendant was still in his automobile with the headlights and flashing colored lights of the Ranger's patrol car behind him (i.e., facing the rear of Defendant's car)  and Ranger Mitrea shining his flashlight on Defendant, Mitrea subjected Defendant to a Horizontal Gaze Nystagmus ("HGN") test.

The HGN is a test in which an officer is to move an object, such as a pen, smoothly across the subject's full field of vision approximately twelve to fifteen inches from the subject's nose and slightly above eye level and ask the subject to follow the object without moving his head or body.  The ranger watches to see if the subject's eyes follow the object smoothly and evenly or if nystagnus (involuntary jerking of the eyes as they gaze toward the side) results.  (*National Highway Traffic Safety Admin., U.S. Dep't of Transp., DWI Detection and Standardized Field Sobriety Testing, Student Manual* VIII-12-15 (1995).) Nystagnus is a natural and normal phenomenon which can be exacerbated by intake of alcohol (Id.) and depressants (but not stimulants, analgesics and cannabis). U.S. v. Everett, 972 F. Supp. 1313, 1317 (D. Nevada 1997), citing to results of a Drug Evaluation and Classification Program created by the Los Angeles Police Department and credited by the National Highway Traffic Safety Administration and the National Institute on Drug Abuse with accurately identifying individuals who had consumed drugs and the class of drugs used.)

Ranger Mitrea reportedly observed a "lack of smooth pursuit" on the part of defendant, i.e., his eyes did not follow the pen equally.

Shortly thereafter, Ranger Mitrea had defendant exit his car and undergo further nystagnus testing with Defendant standing and the flashing lights turned off. At the extremes of vertical nystaganus testing, one eye jumped over to the other side; the two eyes did not move in tandem.  Mitrea read the results of his nystagnus testing as showing four clues of impairment out of a possible six.

(It is noted that after Mitrea turned off the  flashing colored lights on his patrol car and told Defendant he did that so they would not bother Defendant, Defendant responded

"What flashing lights?"  At trial, Defendant said he was just trying to be funny, implying that the lights were quite obvious.)

> b.      Physical Testing.

While Mitrea and Lober discussed privately the results of the visual testing, Lober opined that there was "...more drug stuff going on here." ,  Mitrea advised "...I'm going to finish him...", and then Lober observed that Defedant was having a hard time standing.[3]

Mitrea then returned to Defendant and directed him to perform, first,  a "Walk and Turn Test" (in which the Defendant is to stand with his feet heel to toe, then take nine heel-to-toe steps in a straight line, pivot 180 degrees and  return nine steps heel-to-toe with his arms at his side throughout, all while counting each step out loud).[4]

After the Walk and Turn, Mitrea had Defendant do a "One Leg Stand" in which his arms were to be at his sides and his feet together and he was to lift either leg (his choice) and hold one foot about six inches off the ground and count.

No one disputes that Defendant performed these tests poorly.  Signs of impairment are clear to the untrained as well as the trained eye.  The cause or causes of same are not.

> 8.      Breath Alcohol Concentration.

A field breathalyzer test administered at the location approximately twenty minutes into the stop (after several intervening events)  was read by Ranger Mitrea as indicating Defendant had a blood alcohol concentration of .01, considerably below the .08 level deemed to constitute  presumptive evidence of being under the influence. (36 C.F.R. §

---

[3]The sequence makes it clear Lober was then unaware of  Defendant's physical impairments.  It is not clear why Mitrea had not informed her.

[4] It is just before beginning this test  that Defendant goes into some detail about the nature and effects of his orthopaedic impairments.

4.23.)  Rangers Mitrea characterized this as a low reading, Lober as "very low".  No one

suggested it was high enough to indicate likely alcohol impairment.

> 9.   Slurring words.

Ranger Mitrea testified that at the scene Defendant was increasingly slurring his

words in a manner indicative of alcohol impairment.

## C.   **Ranger Evaluation**

Ranger's Mitrea and Lober discussed what action to take.  Lober acknowledged

"...this is a hard one because he's got physical issues...okay, but you just hear him talking?

It's really..."  Mitrea interjects: "Yeah, it's gotten progressively worse." (It is not clear

whether they were referring to Defendant's staccato speech or to what Mitrea later

characterized as slurring.)  The two rangers discuss Defendant's dry mouth and the fact

his medications proscribe drinking alcohol while taking it.  Mitrea discusses Defendant

having "run" a stop sign and only admitting to one beer initially.  He tells Lober that

defendant  admitted feeling the effect of alcohol and that he was dizzy, that he presented

clues on nystagmustesting, and that he had trouble standing and walking (observed by

Lober).

The two Rangers seemed to agree arrest was appropriate.  Lober says: "Do blood,

you, you know?   You don't want to take a chance. He's...straight-forward about

medication." and refers to  "...medication he can not take with alcohol."

## D.   **DMV Hearing and Probable Cause**

At a January 13, 2011, California Department of Motor Vehicles ("DMV") hearing

into the effect of this incident on Defendant's driving privileges, Ranger Mitrea testified,

under oath, that he came to the conclusion Defendant "was under the influence" because

Defendant "...was on several types of medications that he should not have been drinking alcohol with.  He showed signs of impairment : slurred speech, dizziness.  And he admitted those facts (unintelligible)..." (Joint Ex. III.)

### E.   Trial Testimony Regarding Probable Cause

When asked at trial to list all of the observations he made of Defendant at the scene which lead him to believe that Defendant was under the influence of drugs or alcohol or a combination thereof to a degree that rendered him incapable of safe operation of his vehicle, Mitrea listed the following: 1)  Defendant had difficulty following instructions when asked for his license, registration and insurance; 2)  Defendant's stuttering speech; 3) An odor of alcohol was emanating from Defendant's vehicle; 4) Defendant admitted feeling the effects of alcohol and feeling dizzy; 5)  Defendant's speech was slurred; 6) Defendant had "lied" about his alcohol consumption; 7) Defendant's  eyes tracked unequally on nystaganus testing; 8)  Defendant lacked  balance and tended to sway; and, 9) Defendant performed the Walk and Turn and One Leg Standing test poorly and failed to follow test instructions accurately.  (He stopped counting out loud.  He did not walk ten steps forward and back.)  (Ranger Mitrea actually itemized ten factors, mentioning the two nystagnus tests separately.)

## III.   APPLICABLE LAW

### A.   Probable Cause

Under the Fourth Amendment, a law enforcement officer may stop a motor vehicle if he has probable cause to believe that the operator has committed a traffic law violation. United States v. Choudhry, 461 F.3d 1097, 1100 (9th Cir. 2006), citing Whren v. United States, 517 U.S. 806, 819 116 S.Ct. 1769, 135 L. Ed. 2d 89 (1996), United States v. Willis,

431 F.3d 709, 714-17 (9th Cir. 2005). The court may not invalidate an otherwise lawful stop on grounds that the traffic violation was a mere pretext for the officer's subjective desire to investigate for other criminal activity. Whren, supra.

LaFave on Search and Seizure (Wayne R. LaFave, Search And Seizure: A Treatise On The Fourth Amendment § 3.2(b) (4th ed. 2010)) provides an excellent outline of the very issues facing the Court in this case.  First, citing (at section 3.2, Volume 2, page 25) to a District of Columbia Circuit Court of Appeals decision:

> The contours and salient principles of probable cause have been faithfully catalogued in a surfeit of decisional law. Probable cause exists when known facts and circumstances are sufficient to warrant a man of reasonable prudence in the belief that an offense has been or is being committed. A significantly lower quanta of proof is required to establish probable cause than guilt. Probable cause does not emanate from an antiseptic courtroom, a sterile library or a sacrosanct adytum, nor is it a pristine "philosophical concept existing in a vacuum," but rather it requires a pragmatic analysis of "everyday life on which reasonable and prudent men, not legal technicians, act." It is to be viewed from the vantage point of a prudent, reasonable, cautious police officer on the scene at the time of the arrest guided by his experience and training. It is "a plastic concept whose existence depends on the facts and circumstances of the particular case." Because of the kaleidoscopic myriad that goes into the probable cause mix "seldom does a decision in one case handily dispose of the next." It is however the totality of these facts and circumstances which is the relevant consideration. Viewed singly these factors may not be dispositive, yet when viewed in unison the puzzle may fit.

United States v. Davis, 458 F.2d 819, 821 (D.C. Cir. 1972) (internal citations omitted)."

LaFave, Volume 2, page 35-36, further notes:

> It is clear that probable cause may not be established simply by showing that the officer who made the challenged arrest or search subjectively believed that he had grounds for his action. As the Supreme Court emphasized in Beck v. Ohio:

> We may assume that the officers acted in good faith in arresting the petitioner. But "good faith on the part of the arresting officers is not enough." If subjective good faith alone were the test, the protections of the Fourth Amendment would evaporate, and the people would be "secure in their

persons, houses, papers, and effects," only in the discretion of the police.

The probable cause test, then, is an objective one. This is further reflected in the fact that the Supreme Court has repeatedly said that in order for there to be probable cause the facts must be such as would warrant a belief by "a prudent man," "a man of reasonable caution," or "a reasonably discrete and prudent man." "The scheme of the Fourth Amendment," said the Court in Terry v. Ohio,

> Becomes meaningful only when it is assured that at some point the conduct of those charged with enforcing the laws can be subjected to the more detached, neutral scrutiny of a judge who must evaluate the reasonableness of a particular search or seizure in light of the particular circumstances. And in making that assessment it is imperative that the facts be judged against an objective standard: would the facts available to the officer at the moment of the seizure or the search "warrant a man of reasonable caution in the belief" that the action taken was appropriate?

Wayne R. LaFave, Search And Seizure: A Treatise On The Fourth Amendment § 3.2(b) (4th ed. 2010).

**B.    Blood Testing**

Part 4 of Chapter I of Title 36 of the Code of Federal Regulations (CFR) governs operation of motor vehicles and traffic safety in the national parks of this country. Section 4.23(a)  prohibits the operation of a vehicle while under the influence of drugs or alcohol under specified circumstances  Subsection (c) then provides:

> (c) Tests. (1) At the request or direction of an authorized person who has probable cause to believe that an operator of a motor vehicle within a park area has violated a provision of paragraph (a) of this section, the operator shall submit to one or more tests of the blood, breath, saliva or urine for the purpose of determining blood alcohol and drug content.

> (2) Refusal by an operator to submit to a test is prohibited and proof of refusal may be admissible in any related judicial proceeding.

36 C.F.R. § 4.23(c).

Probable cause must exist for the taking of blood as well as arrest.  A blood test

-14-

constitutes a search of the person within the meaning of the Fourth Amendment. Schmerber v. California, 384 U.S. 757, 768, 86 S. Ct. 1826, 16 L. Ed. 2d 908 (1966). In Schmerber, the Supreme Court found that blood tests constitute a "search and seizure" under the Fourth Amendment. The Schmerber Court held that it did not violate the Fourth Amendment for the police, upon probable cause but absent a warrant, to test a blood sample drawn from a hospitalized DUI, suspect who had declined to take a breathalyser test and did not consent to a blood test. Id. at 772; see also United States v. Chapel, 55 F.3d 1416, 1419 (9th Cir. 1995) (holding that under the Fourth Amendment, "before a law enforcement officer may lawfully take a blood sample without consent or a warrant, he or she must have probable cause to believe that the suspect has committed an offense which the current state of one's blood will constitute evidence.").

IV.   **ANALYSIS**

   A.   **Probable Cause to Arrest**

   And so we examine, in the light of applicable law, the facts and information perceived by Ranger Mitrea and reportedly relied upon by him to conclude there was probable cause to believe that the crime of driving under the influence was being committed by Defendant Hamblin.

   The Court notes that Ranger Mitrea has at different times identified different factors leading to his arrest of Defendant.  Those reasons given by Ranger Mitrea to Ranger Lober at the scene and those given at the DMV hearing are less inclusive than those presented at trial.  The Court initially will analyze all factors mentioned in the course of this case as possible components of the totality of circumstances supporting a determination that probable cause existed to justify arrest and mandatory blood testing.

1.     Running the Stop Sign.

Careless or reckless driving can be a symptom of impairment.  Failing to come to a complete stop in response to a direction to do so from a stop sign constitutes carelessness or disregard for the law.  However, as noted, other than the failure to stop, Ranger Mitrea observed nothing erratic or inappropriate about Defendants' driving.  Indeed both he and the Defendant described the latter's travel through the intersection in a manner more consistent with causation and safety than recklessness or impairment.  Also, the Court is sympathetic to the questionable location of the stop sign in relation to the intersection and to the fact that pavement markings which the National Park Service seems to feel are appropriate were largely absent on the night in question.  Still, given the existence of the stop sign and the intersection and the close proximity of the two, a reasonable person should have known of the need to come to a complete stop, and defendant has admitted to violation of 36 C.F.R. § 4.12 as charged in Count 3 of the Criminal Complaint against him.  Thus, the Court does find Defendant guilty as charged in Count 3.  However, it is unable to conclude that anything relating to that violation could be said to have added in any measurable way to a probable cause determination.

2.     Document Confusion.

Though not substituting its judgment for that of the Ranger at the scene and recognizing that Defendant's admitted nervousness and peculiar speech patterns might be interpreted as showing confusion, the Court is unable otherwise to see any indication of alleged confusion or unusual difficulty in producing documents.  Indeed, the video reveals Ranger Mitrea himself exhibited confusion about the fact Defendant had already given him his registration. Moreover, the Court observes that despite his nervousness, the substance

of defendant's comments throughout the 54 minute recording appears coherent, appropriate, focused, intelligent, reasoned, responsive, and, when and where necessary, properly directive and instructional.  For the most part, Defendant was able to identify and pronounce the names of multiple medications, recall their use and dosage (Ranger Mitrea also had trouble in these regards himself), assist the rangers in searching for and locating his medicines, keys, and phone, recall times and events, remember his camp site number, etc.

### 3.    Defendant's Stuttering Speech; Nervousness.

As noted, Defendant's staccato speech and tendency to clipped, disjointed sentences is obvious on the video.  He admits to nervousness on more than one occasion. However, Defendant displayed precisely the same style of  speech and movement throughout his trial testimony.  The Court can not help but conclude that represents his normal speech and demeanor at least when being questioned by a police officer or testifying in Court (two events which might precipitate nervousness). However, Ranger Mitrea would have no way of concluding, as the Court did after observing Defendant at trial, that such behavior may be the norm for Defendant when under pressure.  Signs of nervousness were factors Ranger Mitrea could reasonably consider to some extent in making his probable cause analysis.

### 4.    Slurred Speech.

As noted, Ranger Mitrea has referred on a couple of occasions to Defendant's increasingly slurred speech as a factor supporting a probable cause finding. The Court has audited the recording of the facts preceding and following arrest three times from beginning to end, and is unable to identify any clear example of slurred speech.   None was

specifically identified at trial. Accordingly the Court can only conclude that Ranger Mitrea is referring to the Defendant's stuttering speech style which already has been analyzed.

### 5.   Odor of Alcohol.

Not only did Ranger Mitrea smell alcohol, but Defendant ultimately acknowledged having consumed an alcoholic beverage within an hour or so of the traffic stop. However, except insofar as it may have interacted with medications, the significance thereof was vitiated once the field Breathalyzer test showed a "really low" .01% alcohol concentration. Thus the presence of alcohol alone could not be said to support a probable cause determination.

### 6.   Medications.

As noted, Defendant told Ranger Mitrea that he had taken a twelve hour Oxycontin pill at 10:30 AM and that he believed he was not supposed to consume alcohol when taking it. The label so indicates. (He also described his other medications, but denied, without refutation, that he had taken any other that recommended against simultaneous alcohol consumption.) Defendant also acknowledged, in the manner described above, that he felt the effects—dry mouth and, equivocally, dizziness—from the medication and/or alcohol. Certainly, those are matters which any reasonable law enforcement officer would and should consider in deciding how to proceed. Still, even these significant facts must be taken in context. First, it appears the stop occurred at or shortly before 10:30 PM. (See Crimnal Complaint and Defendant's Exhibit 1.) Thus, there is a very real question as to whether the Defendant did consume alcohol and drive while the medication had any continued efficacy. Even if it did, one would expect its effect to have diminished over time and question how much would still be in Defendant's system 11 ½ hours or more after

consumption. The admitted dry mouth symptom  suggests some lingering effect, but not one consistent with impairment.   The "dizzy-like" comment from Defendant also is of significance, but it was so fleeting and then so quickly denied that reasonableness would minimize its importance.

### 7.   Effects Admitted.

To his credit, Defendant admitted feeling somewhat out-of-sort, apparently as a result of having consumed a cocktail. He described having a very dry mouth and at one point did suggest he felt dizzy.  However, reviewing the video, one can not help but suspect that Defendant  used the word "dizzy" after searching unsuccessfully for a more accurate way to describe how he felt.   A short time later, when Ranger Lober reiterated his complaint of dizziness, he immediately corrected her and said "Not really dizzy." Reference to dizziness certainly is a factor which could and should be considered by Ranger Mitrea, but, under the circumstances, perhaps with some skepticism.

### 8.   Defendant's Lie.

Ranger Mitrea thought it significant that Defendant originally stated he had had only one beer to drink and that only after further questioning did he also admit having consumed a cocktail.  The Court is unable to envision how such a "lie", i.e., understating one's alcohol consumption to a law enforcement officer, is evidence justifying an arrest.  Moreover, once Defendant admitted to having the cocktail in addition to the earlier beer and once the Breathalizer test results corroborated minimal consumption, the "lie" became much less a lie.  However, the Court does believe that any such misstatement could reasonably give one cause to question the validity of other statements such as, here, describing the amount of medication taken.

9.    Nystagmus Testing.

The nystagnus testing was done in such a way that neither the method of testing nor the results are apparent from the video except in the one instance where Defendant's right eye seemed to jump, or cross with the left, at the extreme of vertical nystagmus.  Regardless, the Court is not trained in the art of testing for nystagmus and can not undertake to supplant its judgment for that of Ranger Mitrea as to how to administer the tests and/or interpret the test.  The Court accepts that the results suggested impairment and that, although there are other possible explanations for same, they were factors to be considered in determining if there was impairment.

10. and 11.    Walk and Turn and Balancing Tests; Swaying.

Given the Defendants obvious and documented physical impairments, the Court concludes that no weight reasonably should have been given to the results of these field tests. Ranger Mitrea testified at trial that he thought it appropriate to conduct these tests and to consider the results in his probable cause determination. Later in the  trial he suggested he focused on Defendant's mental lapses (forgetting to count out loud, turning before taking ten steps[5]).  It is difficult to imagine why the tests were given at all.  Since they were, these mental lapses must be considered in context:  Defendant had already admitted to and displayed profound nervousness.  He was being told to do something he knew he was physically incapable of doing. He was being told to do it by someone who seemed to disregard his physical disabilities.  He had to realize that that person held his immediate fate in his hands.  These facts and the increased nervousness they likely produced constitute a more logical explanation for the mental lapses than chemical

[5]At the scene Ranger Mitrea instructed Defendant to take nine steps.

impairment. Apparently Ranger Mitrea disbelieved Defendant's pre-existing medical problems left him as impaired as claimed.  He thought Defendant moved his ankle through a full range of motion.   Ranger Mitrea also noted that although Defendant had had back surgery a year earlier, he had been told it would take only a year to recover.  There is no evidence Ranger Mitrea was qualified to evaluate range of motion or to determine whether Defendant had recovered from his surgery. At trial Defendant explained he was still impaired and able only to move the ankle, along with his shin and calf, from the knee, not at the joint.  The medical testimony was supportive.

Review of the foregoing leaves the Court with the following as the **sum total of reasonable suggestions of the possibility of impairment** presented to Ranger Mitrea:

1)  Defendant's nervousness and unusual speech pattern;

2)  Defendant's admission that he had consumed alcohol at a time when he might still have had Oxycontin in his system;

3)  Defendant's admission that he experienced dry mouth and, possibly, a dizzy-like feeling after having consumed a cocktail;

4)  Defendant's  reported nystagmus; and,

5)  Defendant's initial failure to disclose his full alcohol intake arguably raising a question as to whether he was being truthful about his consumption of medicine.

The Court's responsibility is to consider the totality of these factors and all the circumstances at and surrounding the scene from the viewpoint of a "prudent, reasonable, cautious police officer" and determine if the factors are such as to cause such an officer, guided by his training and experience, to believe an offense has been or is about to be committed.  Even thought the Court and others might have reached a conclusion different

on the same facts, the Court's role is not to substitute its judgment for that of a trained officer acting prudently and cautiously at the scene.

With this in mind the Court cannot deny that pragmatic analysis of the above factors and everyday life on which reasonable and prudent men act would lead the reasonably cautious law enforcement officer to conclude that arrest of the Defendant was appropriate and reasonably necessary for the safety of the Defendant and the community.   An individual operating a motor vehicle, a machine capable of causing, and all too frequently causing, death when mishandled, acknowledged drinking alcohol despite having taken medication not to be taken with alcohol, admitted feeling the effects of same, seemed nervous and displayed evidence of dishonesty, and performed poorly on nystagmus testing designed to identify impairment.   A prudent man would be ill-advised to allow such an individual to resume driving.[6]   A prudent man would agree there was probable cause to arrest the Defendant.   The Court so finds.

## B.   Refusal of Blood Test

Where, as here, an "authorized person", i.e., National Park Service Law Enforcement Ranger Mitrea, has probable cause to believe an individual is driving under the influence in violation of 36 C.F.R. § 4.23(a), the driver "shall" submit to one or more tests of blood, saliva, urine or breath to determine blood alcohol or drug content; refusal to submit to a test "is prohibited".  36 C.F.R. § 4.23(c).

As noted, Ranger Mitrea had probable cause to believe Defendant was driving under the influence.   He transported Defendant to the Yosemite Medical Clinic to have

---

[6]Nevertheless, the Court can not help but wonder if the ranger could, with impunity, have erred in the opposite direction by, for example, releasing Defendant upon his giving an enforceable commitment not to drive.

Defendant's blood drawn and tested for drug and alcohol content. He advised Defendant that he was required by law to submit to the test and that if he refused he would be charged with the refusal and lose his license. He asked Defendant three times if Defendant would submit to the test. The video reveals, and Defendant does not dispute, that Defendant refused each and every request to allow his blood to be drawn.

At trial and in his California Department of Motor Vehicles hearing Defendant maintained that his refusal was based upon a profound and well-justified fear of needles. He testified in essence that he had, some years earlier, reported to the Yosemite Medical Clinic for blood testing and that medical personnel had beenunable after several attempts to reach a vein and obtain a blood sample. More significantly, he later developed a severe staph infection in his spine which led to an eighteen day hospitalization, a prolonged period of recovery and his present difficulties walking and balancing. His physician told him that needles were a likely source of staph infection and that he should avoid them.

The parties were asked to and did submit post-trial briefs on the issue of whether federal law allows such considerations to excuse a refusal to submit to a blood draw. Neither party identified any exceptions to 36 C.F.R. § 4.23's direction that a Defendant "shall submit" to such a test. Plaintiff noted that various state laws make exception for "rational and communicated fear" of testing and argued that similar exception should be applied here.

The Court need not address the issue of whether any such exception or excuse exists under federal law. Under all cited characterizations of the exception, the good faith, rational fear must be communicated to the authority directing the test. There is no credible evidence Defendant communicated any such thing to Rangers Mitrea or Lober, to the

medical personnel at the clinic or to anyone else on the night of his arrest. The evidence is quite to the contrary.

All but the very first few minutes of the contact between Defendant and the Rangers were video recorded. There is no plausible reason Defendant would have discussed his fear of needles in those first few minutes when he was being asked for his license, registration and insurance. There was no mention of the possibility of a blood test until long afterwards. Although Defendant does indeed later mention his staph infection and the unsuccessful previous blood drawing at the clinic, nowhere on the recording does he express any fear of needles or give any reason for his refusal to undergo testing beyond stating concern that it might show higher Oxycontin content in his blood. Defendant had multiple opportunities and ample motivation to explain the reason for his fear and his resulting refusal to be tested. The record is clear that he did not communicate any such fear or give any medical explanation for his refusal to be tested.[7]

There being no evidence that the elements of any proposed exception to the testing requirement existed here, the Court concludes Defendant simply refused to comply with the mandatory requirements of 36 C.F.R. § 4.23(c) and that he is guilty of violation of that provision as charged in the First Amended Criminal Complaint.

## V.    **FINDINGS AND CONCLUSIONS**

For the reasons and based upon the evidence described above the Court finds that on August 23, 2010, in Yosemite National Park, defendant did fail to comply with the

---

[7]Defendant testified that he was certain he explained to Ranger Mitrea that his refusal was based on fear arising from the above-described medical history. Defense counsel raised a question as to whether that portion of the exchange may have been deleted from the recording. The defense was given a post-trial opportunity to inquire further into that possibility. Defendant subsequently advised the Court that he was not pursuing that claim.

directions of a traffic control device as charged in Count 3 of the First Amended Criminal Complaint against him and, further, that Defendant did, without justification, refuse to submit to testing to determine blood alcohol and drug content as charged in Count 2 of the First Amended Criminal Complaint.

Accordingly, the court finds Defendant GUILTY of violating 36 C.F.R. §§ 4.12 and 4.23(c)(2) as charged in the First Amended Criminal Complaint.

Sentencing shall take place at 10:00 a.m. on October, 19, 2011, in the Courtroom of the undersigned in Yosemite National Park.  If Defendant wishes he and his counsel may seek waiver of personal appearance at sentencing provided they make themselves available telephonically.


IT IS SO ORDERED.

Dated:   September 12, 2011         /s/ *Michael J. Seng*
                                   UNITED STATES MAGISTRATE JUDGE